STEPHEN CHA-KIM* (NY - 4979357)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: 212.836.8000
Email: stephen.cha-kim@arnoldporter.com

CARSON ANDERSON (CA - 317308)
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA  94306-3807
Telephone: 650.319.4500
Email: carson.anderson@arnoldporter.com

NATALIE STEIERT* (DC - 90010655)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: 202.942.5000
Email: natalie.steiert@arnoldporter.com

OREN NIMNI* (MA - 691821)
AMARIS MONTES* (MD - 2112150205)
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C.  20001-0506
Telephone: (202) 455-4399
Email: oren@rightsbehindbars.org
          amaris@rightsbehindbars.org

SUSAN M. BEATY (CA - 324048)
CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California  94612-4700
Telephone:  (510) 679-3674
Email: susan@ccijustice.org

MARK RAFTREY (CA - 352610)
BROOKE D'AMORE BRADLEY (CA -
353030)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: 415-471-3361
Email: mark.raftrey@arnoldporter.com
brooke.damorebradley@arnoldporter.com

*Pro hac vice pending

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| A.C.,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA; UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; RAY J. GARCIA; and DARRELL SMITH,<br><br>    Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 2

THE PARTIES ..................................................................................................................... 3

CONDITIONS PRECEDENT TO FEDERAL TORT CLAIMS ACT CLAIMS ............... 5

JURY DEMAND .................................................................................................................. 5

FACTUAL ALLEGATIONS ................................................................................................ 6

I.      Federal Law Requires BOP to Take Action to Prevent and Appropriately Respond
        to Reports of Staff Sexual Misconduct ................................................................... 6

II.     Officer RAMOS Repeatedly Subjected Plaintiff To Sexual Harassment ............ 10

III.    Defendant SMITH Forced Plaintiff To Do Sexual Favors in Exchange for Being
        Released from Her Cell .......................................................................................... 12

IV.     Officer DINES Rubbed His Testicles on Plaintiff's Property and Retaliated Against
        Plaintiff .................................................................................................................. 14

V.      Officer BLANCA Ordered Plaintiff to Stand Naked for Her ............................... 14

VI.     Although Plaintiff Reported Officers RAMOS, DINES, and BLANCA and
        Defendant SMITH,  Including to Defendant GARCIA, Nothing Was Done, and
        Plaintiff Was Eventually Transferred to FCI Phoenix .......................................... 15

CLAIMS FOR RELIEF ..................................................................................................... 18

PRAYER FOR RELIEF ..................................................................................................... 33

COMPLAINT

Plaintiff A.C. ("Plaintiff"), by and through her attorneys allege against the Defendants as above captioned as follows upon information and belief:

**INTRODUCTION**

1.      For years, people incarcerated at the Federal Correctional Institute, Dublin ("FCI Dublin"), a federal female low-security prison with an adjacent satellite camp, have been subjected to rampant, horrific, and ongoing sexual abuse that continues to this day, including but not limited to: rape and sexual assault; manipulation and sexual coercion, including officers entering into relationships with incarcerated individuals and officers forcing incarcerated individuals to undress in order to be released from cells or for exchange of goods; degrading sexual comments; voyeurism;  taking and sharing explicit photos; drugging, groping, and other forms of abuse during medical exams; and targeted abuse towards immigrants under threat of deportation.  The Federal Bureau of Prisons ("BOP") and employees at every level have been aware of these problems for decades and have failed, and continue to fail to take action to protect those in its care by preventing and addressing rampant staff sexual misconduct.

2.      The staff sexual abuse at FCI Dublin became the center of a sprawling criminal investigation, multiple Congressional inquiries, and national media attention.  The United States Senate's Permanent Subcommittee on Investigations devoted multiple hearings to addressing its causes and impact, and issued a report in December 2022 describing the abuse as "horrific" and Defendant BOP's investigative practices as "seriously flawed," and concluding that "BOP management failures enabled continued sexual abuse of female prisoners by BOP's own employees."[1]

3.      Congress enacted the Prison Rape Elimination Act in 2003, 34 U.S.C. § 30301, *et seq.* ("PREA") to establish national standards for preventing precisely this kind of sexual abuse from happening to incarcerated people.  Under PREA, the U.S. Department of Justice promulgated

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 1 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf (hereinafter "Senate Report").

COMPLAINT

1   detailed mandatory regulations that provide precise procedures that prisons must follow.  The

2   Federal Bureau of Prisons ("BOP") adopted PREA policies in response to these regulations.

3       4.    Despite these mandatory protections, while incarcerated at FCI Dublin from 2020

4   to 2021, Plaintiff was forced by Defendant SMITH to do sexual favors in exchange for being

5   released from her cell. In doing so, Defendant SMITH violated Plaintiff's Constitutional rights and

6   California law on gender violence, sexual assault, and common law on battery.  Plaintiff was also

7   sexually harassed by Officers RAMOS, BLANCA, and DINES.

8       5.    As a result of Defendants' (including Defendants GARCIA and JONES) actions,

9   Plaintiff suffered numerous emotional injuries and incurred severe personal injuries, which

10   continue to affect her today.

11       6.    Plaintiff brings this suit under the United States Constitution Eighth Amendment's

12   prohibition on cruel and unusual punishment.  Plaintiff also brings this suit under the Federal Tort

13   Claims Act ("FTCA") 28 U.S.C. §§ 2671, *et seq.*, under state law on gender violence and sexual

14   assault, and in connection with the deficient supervision and custodial care provided by various

15   BOP personnel, including Defendants SMITH and GARCIA within the scope of their employment

16   within the BOP.  Plaintiff also brings this suit under the Trafficking Victims Protection Act

17   ("TVPA") 22 U.S.C. §§ 7101, *et seq.*

18   **JURISDICTION AND VENUE**

19       7.    This Court has original subject matter jurisdiction in this action involving claims

20   arising under the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1346 (b).

21   Plaintiffs' claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing

22   actions seeking relief against the United States.

23       8.    The Court has personal jurisdiction of the Defendants because the alleged incidents

24   occurred within the confines of the State of California.

25       9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b) as

26   a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the

27   boundaries of this District, in the County of Alameda.

28

COMPLAINT

**THE PARTIES**

10.     At all times relevant hereto, Plaintiff was incarcerated in the custody of BOP, incarcerated at FCI Dublin located at 5701 8th St., Dublin, CA 94568.  On September 27, 2021, Plaintiff was transferred to FCI Phoenix located at 37900 N 45th Ave., Phoenix, AZ 85086. Plaintiff has been released to her community through compassionate release and resides in California.

11.     Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiffs' claims under the Federal Tort Claims Act.  The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

12.     At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FCI Dublin and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Defendants GARCIA and SMITH.

13.     In addition, at all relevant times, United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

14.     Officer NICHOLAS T. RAMOS ("Officer RAMOS") was an Officer at FCI Dublin during the time period relevant to events described herein.[2]

15.     Defendant DARRELL SMITH ("Defendant SMITH") was an Officer at FCI Dublin during the time period relevant to events described herein and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Defendant SMITH was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

---

[2] In August 2022, former Dublin Officer Nicholas T. Ramos died by suicide while on administrative leave and under investigation for sexually abusing incarcerated women.

COMPLAINT

16.     Officer DINES ("Officer DINES") was an Officer at FCI Dublin during the time period relevant to events described herein.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer DINES was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

17.     Officer BLANCA ("Officer BLANCA") was an Officer at FCI Dublin during the time period relevant to events described herein.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer BLANCA was acting within the scope of her official employment, or with the BOP's permission and consent and under color of federal law.

18.     Defendant RAY J. GARCIA ("Defendant GARCIA") was the associate warden at FCI Dublin between December 2018 and November 2020, and the warden of FCI Dublin from November 2020 to July 2021. At all times relevant hereto, Defendant GARCIA was the Warden, Associate Warden, Correctional Officer, and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Defendant GARCIA was responsible for the day-to-day oversight, supervision, care, custody, control, direction, safety, and well-being of people confined at FCI Dublin, including Plaintiff.  Defendant Garcia is sued in his individual capacity.

19.     At all times relevant hereto, Defendant United States, acting through the BOP, hired Defendants GARCIA and SMITH and Officers DINES and BLANCA to serve as "correctional officers" and "law enforcement officers" within the meaning and powers of 28 U.S.C. § 2680(h).

20.     While acting and failing to act as alleged herein, Defendants had complete custody and total control of Plaintiff, who was dependent upon Defendants for personal security and necessities.

21.     In performing the acts and/or omissions contained herein, Defendants acted under color of federal law, and each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff.  Each of them knew or should have known that their conduct, attitudes, actions, and omissions were a threat to Plaintiff and to their constitutionally and statutorily protected rights.  Despite this

COMPLAINT

knowledge, Defendants failed to take steps to protect Plaintiff and to ensure that their rights were adequately protected while in the custody of Defendants.

22.     At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant.  At all times relevant hereto, each Defendant was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent.  At all times relevant hereto, each Defendant was the authorized agent, partner, servant, or contractor of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of each other Defendant. Accordingly, each of them is jointly and severally liable to Plaintiff.

23.     Individual Defendants further directly assaulted, harassed, demeaned, degraded, and trafficked particular Plaintiffs as alleged herein.

**CONDITIONS PRECEDENT TO FEDERAL TORT CLAIMS ACT CLAIMS**

24.     Plaintiff brings claims under the Federal Tort Claims Act, asserted against the United States of America.

25.     Plaintiff exhausted these claims against the United States in accordance with the requirements of the FTCA.

26.     Plaintiff submitted a "Claim for Damage, Injury, or Death" to the BOP as a PREA victim involving staff at FCI Dublin in the sum of $10,000,000.00.  The BOP received her administrative claim on April 3, 2023.  By October 3, 2023, six months after BOP received Plaintiff's administrative claim, the BOP has neither accepted nor rejected the claims.  Pursuant to 28 U.S.C. § 2675(a), Plaintiff considers this failure to act as a final denial of the claims.

**JURY DEMAND**

27.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues and claims in this action that are so triable.

COMPLAINT

## FACTUAL ALLEGATIONS

**I.      Federal Law Requires BOP to Take Action to Prevent and Appropriately Respond to Reports of Staff Sexual Misconduct**

28.     Prison staff sexual abuse of incarcerated people constitutes a form of torture that violates the Eighth Amendment.  *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020).  Such abusive sexual contact also violates federal criminal law.  *See, e.g.*, 18 U.S.C. §§ 2243, 2244.

29.     The Prison Rape Elimination Act ("PREA") of 2003 required the Attorney General to promulgate rules to prevent sexual abuse in prison facilities.  *See* 34 U.S.C. § 30307.  In 2012, the U.S. Department of Justice issued regulations designed to "prevent, detect, and respond to prison rape."  *See* 28 C.F.R. § 115, 77 Fed. Reg. No. 119 (June 20, 2012).  These regulations were immediately binding on BOP facilities.  *Id.*

30.     Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; prevention, reporting, detection, and response to such behavior; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of sexual abuse in confinement, and "common reactions of … victims"; and "how to avoid inappropriate relationships with inmates."  *Id.* § 115.31(a).  The training must be "tailored to the gender of the inmates at the employee's facility," and the agency must conduct a refresher training on PREA standards every two years.  *Id.* § 115.31(b)–(c).  In off years from the training, "the agency shall provide refresher information on current sexual abuse and sexual harassment policies."  *Id.* § 115.31(c).

31.     PREA regulations mandate staff reporting.  BOP must "require all staff to report immediately . . . any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation."  28 C.F.R. § 115.61(a).

32.     Per PREA regulations, administrative investigations of alleged sexual abuse by a staff member or incarcerated person are required to proceed "promptly, thoroughly, and

6

COMPLAINT

objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). Investigators must be specially trained in sexual abuse investigations and must "gather and preserve direct and circumstantial evidence," including interviewing "alleged victims, suspected perpetrators, and witnesses" and "shall review prior complaints and reports of sexual abuse involving the suspected perpetrator." *Id.* § 115.71(c)-(b). The agency is prohibited from determining an alleged victim's credibility based on their "status as inmate or staff." *Id.* § 115.71(e). Investigations are further required to "include an effort to determine whether staff actions or failures to act contributed to the abuse." *Id.* § 115.71(f). "The departure of the alleged abuser or victim from the employment or control of the facility or agency shall not provide a basis for terminating an investigation." *Id.* § 115.71(j).

33.     Substantiated allegations of potentially criminal conduct must be referred for prosecution and the agency must retain written reports of investigations for five years beyond the end of the staff member's employment. *Id.* § 115.71(h)–(i). After investigating an incarcerated person's allegation that they were abused, BOP must inform that person of whether their allegation was found to be substantiated, unsubstantiated, or unfounded, even if the investigation was completed by another agency. *Id.* § 115.73(a)–(b). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *Id.* § 115.76(b).

34.     PREA also includes measures designed to prevent staff retaliation following incarcerated persons' reports of abuse. PREA requires that BOP establish a policy to prevent retaliation, and that staff monitor retaliation, provide "emotional support services for inmates . . . who fear retaliation," and monitor for at least 90 days the conduct and treatment of incarcerated people who report abuse. *Id.* § 115.67. These protective measures include strict limits on the use of administrative segregation. The regulations provide: "Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and . . . there is no available alternative means of separation from likely abusers. If a facility cannot conduct such an assessment immediately, the facility may" hold the individual in segregated housing for "less than 24 hours while conducting the assessment." *Id.* § 115.43(a). Any incarcerated person placed in protective custody for this

COMPLAINT

purpose "shall have access to programs, privileges, education, and work opportunities to the extent possible." *Id.* § 115.43(b).

**II. FCI Dublin Leadership and Staff Allowed Sexual Assault to Flourish.**

35.     Eight former officers—including former Warden Ray Garcia and a former chaplain—have been charged with sexual misconduct for incidents spanning from 2019 into 2021, with more charges likely forthcoming.  *See United States v. Garcia*, No. 4:21-cr-00429-YGR (N.D. Cal.) (sentenced to 70 months in prison and 15 years of supervised released following jury trial); *United States v. Highhouse*, No. 4:22-cr-00016-HGS (N.D. Cal.) (sentenced to 84 months in federal prison and 5 months of supervised release following guilty plea); *United States v. Chavez*, No. 4:22-cr-00104-YGR-1 (N.D. Cal.) (sentenced to 20 months in federal prison and 10 years of supervised release following guilty plea); *United States v. Klinger*, No. 4:22-cr-00031-YGR (N.D. Cal.) (plead guilty to three counts of sexual abuse of a ward); *United States v. Bellhouse*, No. 4:22-cr-00066-YGR (N.D. Cal.) (sentenced to 63 months in federal prison and 5 years of supervised release following jury trial); *United States v. Smith*, No. 4:23-cr-00110-YGR-1 (charges pending); *United States v. Nunley*, No. 4:23-cr-00213-HSG (N.D. Cal.) (awaiting sentencing following guilty plea for 4 counts of sexual abuse of a ward, 5 counts of abusive sexual contact, and 1 count of false statements to a government agency); *United States v. Jones*, No. 4:23-cr-00212-HSG (N.D. Cal.) (sentenced to 96 months in federal prison and 10 years of supervised release following guilty plea for 6 counts of sexual abuse of a ward and 1 count of false statements to a government agency).

36.     Defendant GARCIA was the associate warden at FCI Dublin between December 2018 and November 2020, and the warden of FCI Dublin from November 2020 to July 2021 – a time that overlapped with Plaintiff being abused by Defendant SMITH and Officers DINES and BLANCA.  As the warden, Defendant GARCIA was responsible for safekeeping, care, protection, discipline, programming, and release of inmates incarcerated at FCI Dublin.  Defendant GARCIA was also responsible for hiring, training, and supervising/managing staff, and determining operating procedures and policies.

37.     Defendant GARCIA was found guilty of three counts of having sexual contact with

8

an incarcerated person, four counts of abusive sexual contact, and one count of lying to the FBI. Defendant GARCIA was sentenced to 5 years and 10 months in prison.

38.    In May 2023, Defendant Officer SMITH was also indicted on 12 counts for sexually abusing three incarcerated women and is currently awaiting trial.  Defendant SMITH— widely known as "Dirty Dick Smith"—abused dozens of incarcerated women beginning as early as 2015 and continuing until at least August 2021.

39.    Defendant GARCIA led training on the Prison Rape and Elimination Act and chaired the audit of FCI Dublin under the PREA.  Thus, the man responsible for reporting incidents to the government and teaching inmates how to report rape was in fact a serial rapist of incarcerated people, and he was clearly tolerating and allowing abuse by many more of his underlings, including Defendant SMITH and Officers DINES and BLANCA.

40.    Defendant GARCIA had actual knowledge that the other correctional officers under his supervision were sexually assaulting inmates before and after Plaintiff was abused.  Despite this knowledge, Defendant GARCIA did not do anything to stop it, even though he had a duty to do so.  Due to the fact that Defendant GARCIA had knowledge of prior sexual abuse at FCI and failing to do anything about it, it allowed FCI agents, representatives, and employees to abuse Plaintiff.

41.    Defendant GARCIA had actual knowledge that inmates complained about the assaults.  Defendant GARCIA knew or should have known that the inmates were subjected to retaliation.  Because Defendant did not investigate complaints of abuse and harassment and did not do anything to stop it, inmates, including Plaintiff, were abused.  Had Defendant GARCIA taken reasonable actions, which he was under a legal duty to perform, Plaintiff would not have been abused.  Defendant Garcia's intentional indifference to inmate abuse was a substantial factor in Plaintiff suffering abuse.

42.    PREA guidelines and FCI Dublin policies and procedures required all inmate complaints of sexual assault and sexual abuse filed or reported internally be reported to Defendant GARCIA.  During GARCIA's tenure, complaints of sexual assaults of inmates by correctional officers and/or staff were reported.

COMPLAINT

43.    With knowledge of prior abuse against inmates by FCI Dublin, representatives, and employees, Defendant GARCIA failed to protect the inmates and turned a blind eye. Such behavior set the tone for rape culture at FCI Dublin, garnering Garcia and his subordinate correctional officers and employees the nickname – "the Rape Club."

44.    Further, Defendant GARCIA and others inadequately supervised and trained the prison's correctional officers and other employees, including Defendant SMITH and Officers DINES and BLANCA. The UNITED STATES failed to supervise which was a substantial factor in causing Plaintiff's abuse.

45.    Defendants repeatedly violated the law. From inadequate training, to lack of confidential reporting mechanisms and access to outside support services, to failures in administrative investigations, widespread misuse of administrative segregation, and rampant staff retaliation, its actions—and failures to act—created an environment that exposed Plaintiff to an unconscionable risk of sexual violence. As one survivor of staff sexual abuse at Dublin remarked at the trial of Defendant GARCIA, PREA "really doesn't exist in Dublin." Transcript at 401, *United States v. Garcia*, No. CR-21-00429-YGR (N.D. Cal. Nov. 29, 2022).

## II.    Officer RAMOS Repeatedly Subjected Plaintiff To Sexual Harassment

46.    Plaintiff was incarcerated at FCI Dublin beginning on or around February 2020.

47.    Officer RAMOS began to sexually harass Plaintiff almost immediately after she entered FCI Dublin in February 2020. Officer RAMOS first called Plaintiff to see him in the yard. He looked her up and down and asked where she bought her clothes. He then said, "Well you'll be seeing me around," in a suggestive tone. After this first instance, Officer RAMOS often found Plaintiff in the yard and made inappropriate sexual comments about her.

48.    Officer RAMOS also often came to Plaintiff's cell without reason to harass her. The first time she noticed Officer RAMOS doing this, she looked out her cell window to find Officer RAMOS watching her. He said, "You called me here," even though she had not. She told him she did not call him to her room, and then he asked, "Are you calling me a liar?" He ordered her and her cellmate to leave her cell. Officer RAMOS whispered in Plaintiff's ear, "I can do whatever I want in your room, I can have fun in your room." Officer RAMOS then ordered her to

give him the earrings she had been wearing for many days without issue and conducted a search of Plaintiff's belongings and confiscated them without cause—this included personal pictures, notes, letters, and emails.  Officer Ramos said he would come back to her room and that he would "keep an eye on her."  Plaintiff was especially vulnerable during this incident because her mom and nephew had just died.

49.     Other times when Officer RAMOS visited Plaintiff's cell, he asked her to do pointless tasks so he could watch her do them, including dropping things in Plaintiff's cell and then asking Plaintiff to pick the up so he could watch her bend over and stare at her buttocks.  He did this about five times, with the last time occurring in April 2021.

50.     Officer RAMOS ordered Plaintiff to walk laps around the prison so he could watch her do them.  Plaintiff worked in the safety unit during this time, and he often came by her work and harassed her by standing right behind her and watching her push carts from behind.

51.     Officer RAMOS also called Plaintiff and others degrading names such as "you bitches," or "you whores."  Because Plaintiff worked in the Safety Unit, where officers knew there were rampant sexual relationships happening, Officer RAMOS and other officers would ask her, "How much do you charge?"  This insinuated that Plaintiff and other women in Safety were having sex for money.

52.     Officer RAMOS often searched other incarcerated women's cells and took items that prisoners made for their kids, tied them to the back of a vehicle, and drove around the complex, destroying them.  Officer RAMOS threatened Plaintiff saying, "You are the next one," which made Plaintiff constantly fearful that Officer RAMOS would hurt or degrade her at any moment.

53.     Officer RAMOS also told a dentist that Plaintiff worked for that the dentist should "take out her teeth because she has a big mouth," referring to his belief that Plaintiff was reporting Officer RAMOS.

54.     Plaintiff felt unsafe to report this harassment because Officer Ramos had a team of other officers who he harassed other people with.  They often harassed women together and took people's property when they reported or for no reason at all.

**III.    Defendant SMITH Forced Plaintiff To Do Sexual Favors in Exchange for Being Released from Her Cell**

55.    Defendant SMITH also subjected Plaintiff to extensive sexual harassment and forced sexual favors.  Plaintiff heard from other people that Defendant SMITH was known as "Dirty Dick Smith" and targeted Mexican incarcerated women, especially those without legal status or those getting deported soon.

56.    Defendant SMITH would often come to the window of Plaintiff's cell and watch her when she was on the toilet.  Defendant SMITH would also often stare at her after she left the shower when she was in her robe.  Someone mentioned that Defendant SMITH wanted to see Plaintiff's breasts, and Defendant SMITH nodded, indicating he did want to see her topless.

57.    Between January 2021 and March 2021, Defendant SMITH forced Plaintiff to do sexual favors for him on multiple occasions.  During COVID-19, Plaintiff was placed in quarantine and then moved back to Unit C where she was alone without a cellmate.  The first time Defendant SMITH came to her cell in January 2021, Plaintiff's friend came into her room. Defendant SMITH locked her and her friend in the cell. Plaintiff screamed, "What the heck, let us out!"  Defendant SMTH simply laughed and passed the cell, looking into the window, and giving them a suggestive look.  When Plaintiff asked her friend what was going on, she said, "He is really dirty, he wants us to show him our boobs."  Because they both refused to show him their breasts, they remained in the cell for hours.  When he passed the cell, he would look into the window and laugh, threatening Plaintiff and her friend that he was "going to bring Officers Ramos and Perfecto into the Unit," two officers who were known to terrorize Plaintiff and others by taking people to the SHU and searching their cells.

58.    Defendant SMITH locked Plaintiff into her room about 8-10 times within this three-month period.  During this time, Defendant SMITH would come to Plaintiff's cell and ask, "What will you do for me if I open the door?"  Defendant SMITH often asked Plaintiff to lift up her shirt and pull down her pants so that he could see her genitals before he would open the door. Plaintiff felt helpless while Defendant SMITH whispered to "show him" because he would simply laugh when she rejected him.  Plaintiff felt like she had no choice but to expose herself.  Plaintiff

COMPLAINT

showed him her breasts and genitalia.  Sometimes, even when Plaintiff did show Defendant SMITH her body, he would continue to lock her in her cell.

59.     Defendant SMITH also twice ordered Plaintiff to touch herself and masturbate in front of him.  In one incident, Plaintiff was using the toilet when Defendant SMITH passed by her room, came to her cell, and locked the door.  Plaintiff got up and tried to clean herself, but before she could Defendant SMITH said, "Get up and show me, get up and touch yourself."  Plaintiff was forced to masturbate while Defendant SMITH watched.

60.     During this same period in 2021, Plaintiff was knitting in her room and Defendant SMITH came into her cell looking for another person.  Plaintiff got up to walk out of the cell and Defendant SMITH grabbed her breasts and laughed.  Plaintiff said, "What the fuck?" and Defendant SMITH jingled his keys, saying "Do you want me to lock you in again?"

61.     Defendant SMITH often left her in the cell for hours if she refused to get naked, and would play "La Llorona" (the crying woman) and other narcocorridos (Mexican folk songs about drug cartels) from his office which neighbored her cell to taunt her.  He then stared into her cell which was in his line of vision from his office while she was locked in the cell. Plaintiff often screamed and begged Defendant SMITH to let her out, but his response was "maybe tomorrow."

62.     Plaintiff knew that Defendant SMITH did this to other women.  Plaintiff had seen him do this to two other women.  Defendant SMITH often locked one woman downstairs in her unit while Plaintiff was locked upstairs in her cell and Defendant SMITH alternated watching them in their windows.  Plaintiff could hear Defendant SMITH yelling at this incarcerated person below to show him things.  On another occasion, Plaintiff witnessed Defendant SMITH try to lock another woman in a cell across from hers, but he only was prevented from locking her in because she put her arm in the cell door and told him he would only lock her in the cell if he broke her arm.  Other women knew he specifically targeted Plaintiff.  The other incarcerated women often warned Plaintiff when Defendant SMITH was coming.

63.     Defendant SMITH made explicit comments to Plaintiff that clearly indicated that he believed he could do whatever he wanted without accountability.  During one incident of harassment, Plaintiff got very upset and told Defendant SMITH, "I said I'm getting tired of you,

13

leave me alone!" Defendant SMITH responded, "You have no semen so you can't charge me with anything. You need cum to prove anything, and you don't have it." He also repeatedly threatened to bring in Officer RAMOS to terrorize her on at least three occasions when she refused to show him her body or when she screamed to be let out.

64.     During this period of harassment, Plaintiff repeatedly skipped meals in order to avoid Defendant SMITH and Officer RAMOS. Her harassment only ended after she was moved to another unit, three months before leaving Dublin.

## IV.     Officer DINES Rubbed His Testicles on Plaintiff's Property and Retaliated Against Plaintiff

65.     One day in her unit in mid-2020, Plaintiff left her MP3 player charging outside of her cell. Officer DINES picked up the MP3 and asked who it belonged to. Plaintiff stated that it was her MP3 player. In response, Officer DINES rubbed it directly on his testicles under his pants. He shook it down his pant legs and told Plaintiff to pick it up to embarrass and harass her.

66.     Plaintiff reported this inappropriate behavior to Dr. Hong, the psychologist, but subsequently, Officer DINES threatened to push her down the steps.

67.     Shortly thereafter, Officer DINES angrily threw her mattress over the balcony to the open unit. He ordered Plaintiff to pick up the mattress to embarrass her again, and when she refused, she had to sleep on her metal bed frame that night. Another incarcerated person brought the mattress upstairs for her the next day.

68.     Plaintiff also overheard Officer DINES do similar retaliatory acts toward other women. Plaintiff overheard Officer DINES go into her neighbors cell and say, "Hey you fucking dirty bitches" and confront them for reporting him.

69.     Officer DINES also repeatedly made anti-immigrant statements, such as telling noncitizen prisoners that non-English speaking individuals need to learn English if they wanted to stay in the U.S.

## V.     Officer BLANCA Ordered Plaintiff to Stand Naked for Her

70.     Officer BLANCA also watched Plaintiff when she was changing in 2020.

71.     Officer BLANCA was trained by Officer Ramos and had a close relationship with

COMPLAINT

1    him.  Officer Ramos trained BLANCA to open doors without knocking.

2        72.    Officer BLANCA opened the door when Plaintiff was changing after she showered

3    and was naked.  Plaintiff covered her breasts with her hands but Officer BLANCA told her to put

4    down and open her arms and face her while she was naked.  When Plaintiff tried to push back or

5    refuse, Officer BLANCA said, "I can see you naked whenever I want."

6        73.    Plaintiff also saw Officer BLANCA watch other people showering and prisoners

7    would often respond by yelling "PREA!" at Officer BLANCA to make her stop.  Officer

8    BLANCA continued her behavior anyways.  Plaintiff knew that Officer BLANCA was friends

9    with Officer RAMOS.

10   **VI.    Although Plaintiff Reported Officers RAMOS, DINES, and BLANCA and Defendant
          SMITH, Including to Defendant GARCIA, Nothing Was Done, and Plaintiff Was
11        Eventually Transferred to FCI Phoenix**

12       74.    Plaintiff attempted to report the harassment she faced multiple times in a variety of

13   means, but it was clear to Plaintiff that her reporting was futile.

14       75.    Plaintiff first reported her harassment to Defendant GARCIA around April 2020,

15   during the first COVID-19 lockdown.  Whenever Defendant GARCIA walked through the units,

16   Plaintiff reported that his staff was abusing and harassing people.  Defendant GARCIA responded,

17   "I don't know what you are talking about, that's not happening."  This indicated to Plaintiff that

18   this behavior was condoned at all levels, and that if leadership of the prison did not care, nothing

19   would change.

20       76.    Plaintiff sought help and protection from the psychology department, but she

21   received none.  Plaintiff's cellmate worked in the medical department and encouraged Plaintiff to

22   talk to Dr. Hong, the psychologist, about her harassment.  Plaintiff did speak with him about five

23   times about staff abuse, including that she was terrified of her abusers.  To Plaintiff's knowledge,

24   Dr. Hong never did anything to respond to these reports and no PREA report was ever filed for

25   her.  While speaking with him, he would often minimize Plaintiff's experience.

26       77.    The last time Plaintiff reported to Dr. Hong on or around April 2021, she told him

27   that she was afraid of retaliation from Officer RAMOS because she spoke with Defendant

28   GARCIA about abuse she faced the day prior.  While they were speaking, Officer RAMOS came

COMPLAINT

to the psychology unit looking for Plaintiff with Officer DeLuca.  Plaintiff pleaded to Dr. Hong to help her, but he told her to go out and see what Officer RAMOS wanted.  Plaintiff went to her room and found Officers RAMOS and DeLuca waiting for her and strip-searching Plaintiff's cell mate and others in their cell.  Plaintiff asked, "What do you want?" and they said, "You'll see." Officers RAMOS and DeLuca took Plaintiff to the Receiving and Discharge unit.  Plaintiff asked why she was going there, as it is not usually an area people are taken to, and the other women were searched in her cell.  Officer RAMOS told her, "Don't ask questions."  When they arrived, Officer DeLuca made Plaintiff undress and asked her to cough.  Then she told Plaintiff to insert two or three fingers in her vagina.  They asked Plaintiff to do this two or three times, facing away from her and facing towards her.  Plaintiff had never experienced a strip search like this and there was no reason for this invasive search.

78.     After the strip search, Officers RAMOS and DeLuca took Plaintiff to her cell, and she found it destroyed.  All of her personal property was gone, the lights were broken, her clothes were on the floor, and shampoo and oil were poured all over her clothing.  They also took all of Plaintiff's personal papers and records—her calendar, tax papers, notes where she recorded staff abuse, and other important documents.  Plaintiff felt that the message was clear that Officer RAMOS wanted her to keep quiet.

79.     Plaintiff attempted again to report to Defendant GARCIA after this incident, but again he made it clear that they all worked together.  Plaintiff told Defendant GARCIA, "I complained to you, and then the next day they strip searched me and took all my stuff." Defendant GARCIA responded, "I fucking sent [Officer RAMOS] to search your room."  Plaintiff said that she was going to report the Defendant GARCIA to BOP leadership, and he said, "Never mind, it was just a coincidence then, a random search."

80.     Plaintiff twice tried to report to the Special Investigative Specialists, Officer Putnam, and another woman in the same role on three occasions.  They did not offer to help or do anything to address the problem, they simply said they would "look into it" but Plaintiff did not receive any follow up.

81.     Plaintiff attempted to submit a BP-10, a sensitive grievance form.  However, at that

16

1   time, to successfully submit a BP-10, it had to be sent directly to BOP regional office through the

2   mail room.  Officer DeLuca, the officer who conducted the retaliatory search of Plaintiff's cell

3   with Officer RAMOS, worked in the mail room and had previously thrown away all her mail.

4   Because of this, Plaintiff knew that mailing the form would be pointless.

5           82.     Plaintiff was eventually transferred to FCI Phoenix, likely for retaliatory reasons.

6           83.     Around October or November 2021, at FCI Phoenix, Plaintiff submitted a BP-10

7   with emails she sent to case managers about her harassment and abuse.  While she was submitting

8   the BP-10 an officer read her grievance.  When Plaintiff said it was against the law, he said,

9   "Show me the law."  He then called her a troublemaker.  Plaintiff has not received a response ever

10  since.

11          84.     While at FCI Phoenix, Plaintiff has been marked as a "troublemaker" because she

12  was transferred from FCI Dublin.  Plaintiff attempted to get a job but when the officer asked her

13  what facility she was from, he made a face and told her, "Inmates at Dublin make us look bad."

14  As a result, Plaintiff was denied a job.

15          85.     PREA auditors visited FCI Phoenix around June 12 to 16, 2022, and Plaintiff

16  requested to speak to the auditors both days they were onsite.  However, the auditors told her that

17  they did not want to speak with her and said that "she can write them a letter."

18          86.     In late summer 2022, Plaintiff spoke with the United States Attorney's Office and

19  the Federal Bureau of Investigations about her abuse and harassment.  Soon after, Plaintiff's name

20  was released in a news article about the sexual harassment and assault at FCI Dublin.  The facility

21  staff retaliated against her and other women mentioned in the article.  They moved her and fifteen

22  other people to another unit where they were not able to receive video visits and they attempted to

23  stymie legal visits.  When she attempted to get another job at FCI Phoenix, they told her, "It would

24  be an embarrassment if we hired you."

25          87.     As a result of the abuse and harassment, Plaintiff has experienced extreme

26  emotional distress that has resulted in physical and psychological manifestations that continue to

27  affect her.  She now has issues being out by herself,  has an inability to trust people, and feels

28  unable to communicate with strangers.  Since she was released from prison, she has been

COMPLAINT

diagnosed with severe Post-Traumatic Stress Disorder (PTSD) and depression.  She never received any medication or care for her mental health needs while she was at FCI Dublin.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
*Plaintiff Against Defendant SMITH*
**(Eighth Amendment, Cruel and Unusual Punishment)**

88.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

89.     Defendant SMITH subjected Plaintiff to serious bodily harm as defined by the Eight Amendment when he sexually harassed Plaintiff and provided or withheld privileges to coerce sexual favors from Plaintiff.

90.     Defendant's actions and failures described here caused the Plaintiff's physical, emotional, and constitutional harms, and she has a claim for damages for such violations under ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

91.     This claim for damages is cognizable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) because it claims the same harm and injury as recognized in *Carlson v. Green* 446 U.S. 14 (1980) and *Farmer v. Brennan* 511 U.S. 825 (1994), two recognized *Bivens* contexts.

**SECOND CLAIM FOR RELIEF**
*Plaintiff Against Defendant GARCIA*
**(Eighth Amendment, Cruel and Unusual Punishment)**

92.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

93.     Defendant GARCIA was deliberately indifferent to the substantial likelihood of serious harm to Plaintiff.  Despite knowledge, Defendant GARCIA did nothing to prevent the alleged sexual misconduct and, after Plaintiff reported such misconduct, she was retaliated against.

94.     Defendant's actions and failures described here caused the Plaintiff's physical, emotional, and constitutional harms, and she has a claim for damages for such violations under

COMPLAINT

ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

95.     This claim for damages is cognizable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) because it claims the same harm and injury as recognized in *Carlson v. Green* 446 U.S. 14 (1980) and *Farmer v. Brennan* 511 U.S. 825 (1994), two recognized *Bivens* contexts.

## CLAIMS FOR RELIEF UNDER THE FTCA

### THIRD CLAIM FOR RELIEF
*Plaintiff Against the United States*
**(Sexual Assault; Sexual Battery – Cal. Civ. Code § 1708.5)**

96.     Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

97.     Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants, while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

98.     A person commits a sexual battery when he acts with the intent to cause a harmful or offensive contact with another by use of the person's intimate part, and a sexually offensive contact with that person directly or indirectly results.  Cal. Civ. Code § 1708.5(a)(2).

99.     Defendants subjected Plaintiff  to sexual acts, with the intent to cause harmful or offensive contact.  Such contact with Plaintiff was deeply offensive to their personal dignity and would offend a person of ordinary sensitivity.

100.     As a direct and proximate result of the foregoing, Plaintiff suffered psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

101.     Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

### FOURTH CLAIM FOR RELIEF

19

COMPLAINT

***Plaintiff Against the United States***
**(Intentional Infliction of Emotional Distress ("IIED") – California common law)**

102.     Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

103.     Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

104.     A person is liable for IIED when the defendant engages in outrageous conduct, when the defendant intended to cause plaintiff to suffer emotional distress or engaged in the conduct with reckless disregard to the probability of causing plaintiff to suffer emotional distress, the plaintiff suffered emotional distress, and the outrageous conduct was a cause of the severe emotional distress.

105.     Defendant United States, individually or through its agents, servants, contractors, and/or employees, engaged in extreme and outrageous conduct by subjecting Plaintiff to sexual acts while incarcerated in their custody, through the above-described acts and omissions.

106.     Plaintiff's injuries and damages were caused by intentional torts perpetrated by Defendants.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents, including correctional officers, that occurred within the scope of their employment under color of federal law.

107.     At all relevant times, Defendants were acting under color of law by supervising, disciplining, overseeing, monitoring, controlling, directing, restraining, and imprisoning Plaintiff within the scope of their employment for the United States.

108.     Defendants used their authority as law enforcement officers to sexually assault and harass Plaintiff, and as a direct and proximate cause of this conduct Plaintiff has suffered psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

109.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

## FIFTH CLAIM FOR RELIEF
### *Plaintiff Against the United States*
**(Sexual Harassment - Cal. Civ. Code § 51.9)**

110.    Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

111.    Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

112.    A person is liable for sexual harassment when a special relationship exists between a plaintiff and person where there is a considerable imbalance of power; the defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or hostile nature based on gender, that were unwelcome and pervasive or severe; and the plaintiff has suffered or will suffer economic loss or personal injury including emotional distress or violation of a statutory or constitutional right.

113.    There exists in FCI Dublin, as all prisons, an extreme imbalance of power between the officers and the incarcerated individuals.  Officers control every aspect of incarcerated persons lives.  In addition to this always-present imbalance of power, the problem is compounded by retaliation against those who report misconduct.

114.    For purposes of Cal. Civ. Code § 51.9, a special relationship exists/existed between Defendants and Plaintiff due to the coercive power of the officers' positions.

115.    Defendants in this special relationship with Plaintiff violated Cal. Civ. Code § 51.9 by repeatedly sexually abusing her.

116.    Plaintiff has suffered emotional distress as a result, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic

21

injuries.

117.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**SIXTH CLAIM FOR RELIEF**
***Plaintiff Against the United States***
**(Tom Bane Civil Rights Act– Cal. Civ. Code § 52.1)**

118.    Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

119.    Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

120.    A person interferes with another's civil rights if the person uses or attempts to use threats, intimidation, or coercion to interfere with the exercise or enjoyment of rights secured by the Constitution or state or federal laws.

121.    Speech alone is sufficient where the threatened person reasonably fears violence because the person threatening had the apparent ability to carry out the threat.  Because of the coercive, and sometimes violent, nature of a prison and the fact that survivors had seen retaliation before, Plaintiff reasonably feared violence by Defendants.

122.    Defendant United States through its agents, servants, contractors, and/or employees violate Plaintiff's rights, including but not limited to, their right of protection from bodily harm and sexual violation, imposition of punishment without due process, and cruel and unusual punishment.  Defendants violated these rights by threats, intimidation, or coercion.

123.    As a direct and proximate result of the foregoing, Plaintiff has suffered emotional distress as a result, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

124.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

COMPLAINT

### SEVENTH CLAIM FOR RELIEF
#### *Plaintiff Against the United States*
### (Gender Violence – Cal. Civ. Code § 52.4)

125.    Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

126.    Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

127.    Gender violence is a form of sex discrimination and includes a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

128.    The conditions at FCI Dublin are that of coercive conditions, as evident by officers regularly withholding things like out of cell time, or personal property in exchange for sexual favors.  Further, officers exchanged sexual favors for perks that are not normally available to inmates such as treats, alcohol, and the ability to roam the halls.

129.    Defendants discriminated against Plaintiff based on her sex and/or gender when they repeatedly sexually abused her, physically intruding and invading upon her body under coercive conditions.

130.    As a direct and proximate result of the foregoing, Plaintiff has suffered emotional distress as a result, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

131.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

### EIGHTH CLAIM FOR RELIEF
#### *Plaintiff Against the United States*
### (Invasion of Privacy – California common law)

132.    Plaintiff incorporates by this reference every allegation in the preceding paragraphs

COMPLAINT

as if fully set forth herein.

133.    Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

134.    The elements of invasion of privacy are (1) whether the defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion, private affairs or concerns of the plaintiff; (2) the intrusion was substantial, and of a kind that would be highly offensive to an ordinarily reasonable person; and (3) the intrusion caused plaintiff to sustain injury, damage, loss, or harm.

135.    Defendants intentionally and substantially intruded, both physically and otherwise, upon Plaintiff's seclusion when they repeatedly sexually abused her].

136.    Such intrusions were substantial and highly offensive to an ordinarily reasonable person due to their sexual and degrading nature.

137.    As a direct and proximate result of the foregoing, Plaintiff has suffered emotional distress as a result, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

138.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**NINTH CLAIM FOR RELIEF**
***Plaintiff Against the United States***
**(Negligence – California common law)**

139.    Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

140.    Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during

24

work hours.

141.    At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Dublin, including but not limited to wardens, associate wardens, captains, lieutenants, unit managers, counselors, correctional officers, and investigators.

142.    At all relevant times, FCI Dublin personnel, including individual Defendants, held themselves out to Plaintiff as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

143.    **Duty.** United States and all other Defendants had a custodial duty, as well as a mandatory statutory obligation under PREA and BOP policy, to protect Plaintiff, who was incarcerated by the United States, from foreseeable harm, including sexual abuse.  This duty was non-delegable.

144.    BOP policy forbids staff in engaging with sexual activity with inmates and staff may not allow other people to engage in sexual activity.  BOP policy makes clear that all sexual activity with inmates, even non-physical, is against policy.  BOP states that there is no such thing as consensual sex between staff and inmates.

145.    United States and all other Defendants also had a general duty of care to Plaintiff to act as a reasonable prudent person would under similar circumstances.

146.    It was the Defendants' duty to maintain, operate, and control FCI Dublin as a safe and secure space for incarcerated people.

147.    It was the Defendants' duty to protect incarcerated people from foreseeable harm inflicted by BOP personnel.

148.    **Breach of Duty.** The United States, individually or through its agents, servants, contractors, and/or employees acting within the scope of their employment, breached those duties by failing to supervise and operate FCI Dublin in a manner that would have prevented ongoing sexual abuse and retaliation against Plaintiff.

149.    A reasonable administrator would have complied with PREA regulations, including safeguarding against retaliation for those who report misconduct.

COMPLAINT

150.    A reasonable administrator would also not have exposed Plaintiff to the danger of ongoing sexual abuse.

151.    Agents, servants, contractors, and/or employees of Defendant United States knew or should have known about the ongoing sexual abuse against Plaintiff, and in breaching their duty directly exposed Plaintiff to an unreasonable risk of bodily injury and sexual assault.

152.    Despite notice, Defendant United States, through its employees, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff in violation of federal regulations and BOP policy.

153.    The United States, through its employees also failed to train, retain, and supervise officers as well as monitor and investigate them.

154.    When the employer is aware of its employees' tortious conduct, as it was here, and it ignores or assists in it, retention of employees does not represent legitimate policy considerations warranting discretion.

155.    At all relevant times, each of the Defendants stood in such a relationship with the other Defendants as to make each of the Defendants liable for the acts and omissions of all other Defendants in regard to their treatment of Plaintiff.

156.    **Causation.** The United States' negligence in administering FCI Dublin is a direct and proximate cause of Plaintiff's injuries, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

157.    Officers' employment at FCI Dublin was essential to their commission of tortious misconduct, which would not have happened absent their employment and privileges.

158.    Defendant officers' conduct was grossly negligent as they showed complete disregard for rights and safety of Plaintiff.

159.    It was foreseeable to FCI Dublin personnel that Plaintiff was at risk of imminent serious harm including sexual abuse.

160.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**TENTH CLAIM FOR RELIEF**

***Plaintiff Against the United States***
**(Negligent Infliction of Emotional Distress ("NIED") – California common law)**

161.    Plaintiff incorporates by this reference every allegation in the preceding paragraphs as if fully set forth herein.

162.    Plaintiff brings this claim against the United States under the FTCA based on acts and/or omissions of Defendant United States and all other Defendants while working in their official capacities at FCI Dublin.  Defendants are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

163.    The elements of an NIED claim are as follows: (1) the defendant engaged in negligent conduct/a willful violation of a statutory standard; (2) the plaintiff suffered serious emotional distress; and (3) the defendant's negligent conduct/willful violation of statutory standard was a cause of the serious emotional distress.

164.    Defendant officers and the United States engaged in negligent conduct and willful violations of statutory standards by repeatedly sexually abusing Plaintiff, constituting both extreme and outrageous behavior and the negligence.

165.    The United States' negligence in administering FCI Dublin is a direct and proximate cause of Plaintiff's injuries, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

166.    Pursuant to the FTCA, Plaintiff is entitled to recover damages from the United States for the wrongful acts/omissions of its employees.

**CLAIMS FOR RELIEF UNDER THE TVPA**

167.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

168.    The exploitation of vulnerable people is so common that Congress has passed the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et seq*., a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or

COMPLAINT

1    obstructing anti-trafficking enforcement.

2        169.    Specifically, the TVPA punishes anyone who attempts to, conspires to, or actively

3    "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or

4    solicits by any means a person; or . . . benefits, financially or by receiving anything of value, from

5    participation in a [trafficking] venture" while knowing "that means of force, threats of force,

6    fraud, coercion . . . will be used to cause the person to engage in a commercial sex act."  18 U.S.C.

7    § 1591(a); 18 U.S.C. § 1594.

8        170.    "Coercion" means "threats of serious harm to or physical restraint against any

9    person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to

10   perform an act would result in serious harm to or physical restraint against any person" or "the

11   abuse or threatened abuse of law or the legal process."  18 U.S.C. § 1591(e)(2).

12       171.    "Serious harm" means "any harm, whether physical or nonphysical, including

13   psychological, financial, or reputational harm, that is sufficiently serious, under all the

14   surrounding circumstances, to compel a reasonable person of the same background and in the

15   same circumstances to perform or to continue performing commercial sexual activity in order to

16   avoid incurring that harm."  18 U.S.C. § 1591(e)(5).

17       172.    The term "abuse or threatened abuse of law or legal process" means the use or

18   threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or

19   for any purpose for which the law was not designed, in order to exert pressure on another person to

20   cause that person to take some action or refrain from taking some action.  18 U.S.C. § 1591(e)(1).

21       173.    Commercial sex act "means any sex act, on account of which anything of value is

22   given to or received by any person."  18 U.S.C § 1591(e)(3).

23       174.    Additionally, the TVPA punishes anyone who "knowingly provides or obtains the

24   labor or services of a person by any one of, or by any combination of, the following means.

25           (1) by means of force, threats of force, physical restraint, or threats of physical

26               restraint to that person or another person;

27           (2) by means of serious harm or threats of serious harm to that person or another

28               person;

COMPLAINT

1    (3) by means of the abuse or threatened abuse of law or legal process; or

2    (4) by means of any scheme, plan, or pattern intended to cause the person to believe

3    that, if that person did not perform such labor or services, that person or another

4    person would suffer serious harm or physical restraint."

5    18 U.S.C. § 1589 (a).

6    175.    The TVPA punishes anyone who knowingly benefits, financially or by receiving

7    anything of value, from participation in a venture which has engaged in the providing or obtaining

8    of labor or services by any of the means described in subsection (a), knowing or in reckless

9    disregard of the fact that the venture has engaged in the providing or obtaining of labor or services

10    by any of such means, shall be punished as provided in subsection (d).  18 U.S.C. § 1589(b).

11    176.    The term "abuse or threatened abuse of law or legal process" in the forced labor

12    provision means "the use or threatened use of a law or legal process, whether administrative, civil,

13    or criminal, in any manner or for any purpose for which the law was not designed, in order to exert

14    pressure on another person to cause that person to take some action or refrain from taking some

15    action."  18 U.S.C. § 1589(c)(1).

16    177.    The term "serious harm" means "any harm, whether physical or nonphysical,

17    including psychological, financial, or reputational harm, that is sufficiently serious, under all the

18    surrounding circumstances, to compel a reasonable person of the same background and in the

19    same circumstances to perform or to continue performing labor or services in order to avoid

20    incurring that harm." 18 U.S.C. § 1589(c)(12).

21    178.    The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any

22    way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d).

23    179.    The TVPA allows "[an] individual who is a victim of a violation of this chapter [to]

24    bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or

25    conspires to benefit, financially or by receiving anything of value from participation in a venture

26    which that person knew or should have known has engaged in an act in violation of this chapter)

27    in an appropriate district court of the United States and may recover damages and reasonable

28    attorneys fees."  18 U.S.C. § 1595(a).

COMPLAINT

1    180.   Congress grants a plaintiff up to ten years in which to bring a civil action under 18

2    U.S.C. § 1595(c).

3                         **ELEVENTHFIRST CLAIM FOR RELIEF**
                          *Plaintiff Against Defendant SMITH*
4                              **(Sex Trafficking)**

5    181.   Defendant SMITH engaged or attempted to engage in sex trafficking of Plaintiff as

6    prohibited under 18 U.S.C. § 1591, 1595(a).

7    182.   Defendant SMITH forced Plaintiff to engage in commercial sex acts within the

8    meaning 18 U.S.C. § 1591.  These sex acts included forcing Plaintiff to lift up her shirt, pull down

9    her pants, and masturbate in front of him.

10   183.   Defendant SMITH knowingly recruited, enticed, and solicited Plaintiff by letting

11   Plaintiff out of her cell if she performed his requested sex acts.

12   184.   Defendant SMITH made Plaintiff commit these sexual acts through force, fraud, or

13   coercion within the meaning of 18 U.S.C. § 1591. For example by:

14   • forcing Plaintiff to perform acts in her cell where Plaintiff was trapped
         could not easily escape;
15

16   • using power and status as a correctional officer to control movement, to
         facilitate sexual asks, and
17
     • threatening to lock Plaintiff in her cell or have other officers engage in
18     retaliatory acts if she did not perform the sexual asks.

19   185.   These methods of force, fraud, and coercion were a plan designed to make Plaintiff

20   believe that she would suffer serious harm should she not obey his sexual advances.

21   186.   These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

22   network of officers that were intended to cause a person to believe that failure to perform an act

23   would result in serious harm or physical restraint.

24   187.   Defendant SMITH exchanged the benefit of not locking up Plaintiff  in her cell and

25   not having Plaintiff's cell searched for these sex acts.  In this way, Defendant SMITH's conduct

26   constitutes an attempt to engage in sex in exchange for things of value, the definition of

27   commerciality under 18 U.S.C. § 1591.

28   188.   These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18

COMPLAINT

U.S.C. § 1595.

189.     Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and she has a claim for damages for such violations under 18 U.S.C. §§ 1591, 1595(a).

190.     Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

191.     Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

## TWELFTH CLAIM FOR RELIEF
### *Plaintiff Against Defendants SMITH and GARCIA*
### (Obstruction)

192.     Defendant SMITH and GARCIA together and individually obstructed or attempted to obstruct enforcement efforts or investigations into the sex trafficking of Plaintiff under 18 U.S.C. § 1591(d).  They did so in the following ways:

- Defendant SMITH locked Plaintiff in her cell unnecessarily and threatened Plaintiff from refusing or reporting; and

- Defendant GARCIA ordered a retaliatory cell search and stymied Plaintiff's reporting.

193.     These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that were intended to cause a person to believe that reporting would result in serious harm or physical restraint.

194.     These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

195.     Defendants' conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. §§ 1591, 1595.

196.     Defendants' conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

197.     Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

COMPLAINT

reasonable attorneys' fees for the Defendants' wrongful conduct.

**THIRTEENTH CLAIM FOR RELIEF**
*Plaintiffs Against All Individual Capacity Defendants*
**(Conspiracy to Violate the Trafficking Victims and Protection Act, 18 U.S.C. § 1584)**

198.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

199.    The Trafficking Victims Protection Act establishes that "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592 shall be punished in the same manner as a completed violation of such section; . . . [and w]hoever conspires with another to violate section 1591 shall be fined under this title, imprisoned for any term of years or for life, or both." 18 U.S.C. § 1594 (b), (c).

200.    The TVPA allows "[an] individual who is a victim of a violation of this chapter [to] bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a).

201.    Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c).

202.    At all relevant times, Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted, and/or conspired to continue their longstanding practice of exchanging sex for valuable goods or special benefits as defined in 18 U.S.C. § 1591, or obtaining forced labor as defined in 18 U.S.C. § 1589 by coercing incarcerated people to perform sexual acts or to act as lookouts as the Defendants engaged in sexual acts.

203.    All Defendants conspired to recruit, entice, harbor, transport, provide, obtain, maintain, patronize, solicit, or benefit from participation in the sex and/or labor trafficking of Plaintiffs as defined by 18 U.S.C. § 1581 *et seq.*

204.    Defendants committed overt acts in furtherance of the agreement or understanding by committing one or more of the following acts:

COMPLAINT

- Transporting or directing incarcerated people into locations where principal perpetrating officers could engage or attempt in engage in sexual acts;

- Engaging in a range of retaliatory tactics to threaten and silence survivors or witnesses of sexual abuse or trafficking including but not limited to threats of restraint, indiscriminate searches, taunting, and humiliation;

- Knowingly refusing to report abuse or trafficking occurring at FCI Dublin and/or obstructing investigation into abuse or trafficking;

- Ensuring confidential means of reporting abuse is not possible by indiscriminately opening legal mail, monitoring confidential or private communications, interfering with confidential or private communications, and intentionally preventing access to reporting mechanisms such as grievances and other reporting lines;

- Maintaining practices, policies, and procedures that allowed Defendants to benefit from unlawful commercial sex ventures and human trafficking.

205.    Defendants' participation and assistance in the furtherance of an illegal sex trafficking plan and/or purpose was intentional and/or willful and, therefore, Defendants intentionally and/or willfully caused the facilitation of the sex acts in support of their trafficking venture.

206.    Defendants knew or should have known that their acts supported and facilitated a trafficking venture.

207.    Defendants' conspiracy kept Plaintiff and other witnesses of the trafficking from taking meaningful action, resulting in significant injuries to Plaintiff.

208.    Defendants' conduct caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and Plaintiffs have claims for damages for such violations under 18 U.S.C. § 1584; 18 U.S.C. § 1589, 18 U.S.C. § 1591; 18 U.S.C. § 1595.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

### PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, and each of them, as follows:

209.    An award of compensatory, punitive, and nominal damages to Plaintiff in an amount to be determined at trial;

210.    An award to Plaintiff, pursuant to 42 U.S.C. §§ 1988 and 12205 of the costs of this

COMPLAINT

suit and reasonable attorneys' fees and litigation expenses; and

211.    For such other and further relief as this Court may deem just and proper.


Respectfully submitted,

DATED:  March 7, 2024                    ARNOLD & PORTER KAYE SCHOLER LLP

                                         By:   */s/ Carson D. Anderson*
                                               Stephen Cha-Kim
                                               Carson D. Anderson
                                               Natalie Steiert


DATED:  March 7, 2024                    RIGHTS BEHIND BARS

                                         By:   */s/ Oren Nimni*
                                               Ms. Amaris Montes (she/her)
                                               Mr. Oren Nimni (he/him)

                                         Attorneys for Plaintiff

COMPLAINT